```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

              v.                          19 CR 233 (LAK)

MUSTAFA ABDEL-WADOOD,

              Defendant.                  ARRAIGNMENT/CONFERENCE

------------------------------x
                                          New York, N.Y.
                                          April 11, 2019
                                          3:10 p.m.

Before:

                HON. LEWIS A. KAPLAN,

                                          District Judge

                     APPEARANCES

GEOFFREY S. BERMAN,
     United States Attorney for the
     Southern District of New York
ANDREA M. GRISWOLD
ANDREW M. THOMAS
     Assistant United States Attorneys

BENJAMIN BRAFMAN
JACOB KAPLAN
     Attorneys for Defendant

ALSO PRESENT:  DAYNA R. KENDALL, FBI
```

1           THE DEPUTY CLERK:  *United States v. Mustafa Abdel-Wadood.*

3           Government, are you ready?

4           MS. GRISWOLD:  Yes.

5           Good afternoon, your Honor.

6           Andrea Griswold and Andrew Thomas, for the government.

7           We're joined at counsel table by Special Agent Dayna Kendall with the FBI.

9           THE COURT:  Good afternoon.

10          THE DEPUTY CLERK:  Defendant, are you ready?

11          MR. BRAFMAN:  Yes.

12          Good afternoon, your Honor.

13          Benjamin Brafman and Jacob Kaplan for Mr. Wadood, who is present in the courtroom.

15          THE COURT:  Good morning.  Good afternoon.

16          THE DEPUTY CLERK:  Mr. Abdel-Wadood, please listen to your rights.

18          You have the right to remain silent.  You need not make any statement.  Even if you have already made statements to the authorities, you need not make any additional statements.  Any statements that you do make can be used against you.

23          Mr. Brafman, have you received a copy of the indictment?

25          MR. BRAFMAN:  Yes, sir.

|     |                                                                          |
| --- | ------------------------------------------------------------------------ |
| 1   | THE DEPUTY CLERK:  Have you reviewed it with your                        |
| 2   | client?                                                                  |
| 3   | MR. BRAFMAN:  Yes, we've had a brief opportunity to                      |
| 4   | review it.                                                               |
| 5   | THE DEPUTY CLERK:  Do you waive the public reading?                      |
| 6   | MR. BRAFMAN:  Yes, sir.                                                  |
| 7   | THE DEPUTY CLERK:  And how does your client plead?                       |
| 8   | MR. BRAFMAN:  Not guilty, sir.                                           |
| 9   | THE DEPUTY CLERK:  Thank you.                                            |
| 10  | THE COURT:  Okay.  Ms. Griswold, brief summary please.                   |
| 11  | MS. GRISWOLD:  Yes, your Honor.                                          |
| 12  | The defendant was arrested at 10 a.m. this morning at                    |
| 13  | a hotel in Manhattan while on a visit to the United States.              |
| 14  | The government unsealed two indictments in this case                     |
| 15  | today.  The first is an indictment charging Arif Naqvi with              |
| 16  | conspiracy, securities fraud, and wire fraud.  Mr. Naqvi was             |
| 17  | arrested yesterday in the United Kingdom.  Our office is                 |
| 18  | seeking his extradition to the United States.                            |
| 19  | The S4 superseding indictment was filed and unsealed,                    |
| 20  | charging Mr. Abdel-Wadood with the same charges.                         |
| 21  | As described in these indictments, the charges in this                   |
| 22  | case relate to the collapse of The Abraaj Group, a global                |
| 23  | private equity firm that managed more than $13 billion at its            |
| 24  | peak in a series of separate private equity funds.                       |
| 25  | In mid 2018, the firm collapsed amid allegations of                      |

misconduct in what is now the largest private equity insolvency.

Some very brief background on Abraaj is useful context for the charges here.

Mr. Naqvi founded The Abraaj Group in 2002. And as Abraaj sought to raise additional funds, Abraaj painted a picture that it was very successful. It painted a picture that it had made good investments, had a good track record, and maintained a healthy balance sheet. It also represented itself as a pioneer of impact investing or investing that had a socially responsible impact, that is, doing good while doing well.

An Abraaj fund premised on this concept was the Abraaj Global Markets Healthcare Fund, a $1 billion fund that promised to make investments in hospitals and related projects in developing countries. This concept attracted many U.S. investors, including U.S. financial institutions, retirement and pension funds, a United States philanthropic foundation, and an agency of the U.S. Government.

In truth, Abraaj was engaged in a massive fraud. As described in the indictments, the fraud fell into two principal buckets.

In the first bucket, the overvaluation fraud, Abraaj solicited and retained investor monies based on providing them with materially false historical performance figures for Abraaj

funds.  Put more simply, Abraaj told current and prospective investors that the assets its fund owned were worth significantly more than they actually were.

In truth, Abraaj inflated the value of assets held by its private equity funds by more than half a billion dollars.  As alleged in the indictments, by overvaluing its assets, Abraaj was able to do two things:  Earn more fees, and retain its investors and grow by getting more investors.

In 2017 and 2018, Abraaj was working to launch its most ambitious fund to date, a $6 billion fund, using this false track record to do so.  Three billion in capital had been committed before the firm collapsed.

In the second bucket of this fraud, the misappropriation fraud, this is a tool used by Abraaj to hide the fact that it was not, in fact, successful.  Abraaj misappropriated investor monies that had been advanced for the specific purpose of making particular fund investments, investments in things such as hospitals.  And they secretly diverted those funds to cover undisclosed liquidity shortfalls at Abraaj.

For example, monies culled down from healthcare fund investors, where the investors were told that those monies would be used to fund hospital and related projects, was actually used to pay expenses incurred by other Abraaj funds or diverted, including to Mr. Naqvi personally.

            In total, hundreds of millions of dollars of investor funds were misappropriated from Abraaj private equity funds and diverted for unapproved purposes.

            In terms of the roles here, Mr. Naqvi was the architect of this fraudulent scheme.

            The defendant that's present here today was a managing partner. He was on the investment committee, and he had responsibility for signing off on the valuation of investments. And, in particular, investments in the Middle East and north Africa region, which were many of the investments that had been inflated, and that these false investments were provided to investors.

            The discovery in this case, your Honor, is significant. It includes recorded conversations, including meetings in which the overvaluation is explicitly discussed; incriminating encrypted messages, including involving this defendant; cooperating witnesses; bank records, the tracing of which reflects the misappropriation; emails obtained pursuant to search warrant; as well as the applications that we will produce for those warrants.

            I should also note that the government expects to file a superseding indictment, including additional allegations and detail. The government moved forward because the defendant in this case was present in the United States this week unexpectedly, but we do expect to file a superseding

1    indictment.

2           Today the SEC is also expected or already has filed a

3    civil action against Mr. Naqvi and one of the Abraaj holding

4    companies, Abraaj Investment Management Limited.  When we

5    obtain a copy of that, we will provide a courtesy copy to the

6    Court.

7           THE COURT:  Okay.  Thank you.

8           Talk to me please about the volume of discovery.  I

9    understand that there's a lot of it.

10          MS. GRISWOLD:  Fair enough, your Honor.

11          We're talking likely millions of records.  It consists

12   of certain voluntary productions, emails, subpoena returns,

13   productions that we obtained from the Securities and Exchange

14   Commission for subpoenas that they issued.

15          We will need a 150-gigabyte hard drive, plus two

16   terabytes in order to produce these materials to the defense.

17          In terms of what might give rise to a motion, there is

18   no post-arrest statement in this case.  There are two

19   applications, one for a geolocation device on the defendant's

20   phone while he was here in the U.S., and then a more

21   substantive application to search an electronic hard drive that

22   contains millions of emails and other records related to this

23   case.  So that is the biggest significant chunk, are the emails

24   that we need to produce in this case.

25          And we also, I'm leaving out -- Mr. Thomas has pointed

1   out to me there's also a Title III in this case.  It was not on
2   the defendant's phone, but he was intercepted on that phone.
3   So there will be recordings that he may have standing to
4   challenge.
5           THE COURT:  What's your timing on the superseder, as
6   you see it?
7           MS. GRISWOLD:  We expect that we will file it by the
8   end of May, your Honor.
9           THE COURT:  Do you anticipate adding defendants?
10          MS. GRISWOLD:  Our investigation is very active and
11  very much ongoing, and that is certainly possible.
12          THE COURT:  Okay.
13          What else can you tell me, anything?
14          MS. GRISWOLD:  Nothing else that I wanted to make sure
15  your Honor was aware of; although I'm happy to answer any
16  questions.
17          THE COURT:  Where does this defendant normally reside?
18          MS. GRISWOLD:  The government's understanding is that
19  his primary residence is in Dubai, in the UAE; that he is an
20  Egyptian national who also was naturalized in Malta; and that
21  he has limited travel to the United States.  I believe the last
22  time he was here was prior to the public reporting about the
23  collapse of The Abraaj Group, but some other international
24  travel that we're aware of.
25          THE COURT:  Okay.

And the last UK extradition that I waited for took 14 years. I know they say they have changed things in the UK, but can you give me a window on the estimated time frame there?

MS. GRISWOLD: I don't have any good information for your Honor. We are going to press as quickly as possible to have the extradition proceeding. We will certainly get our part of the equation in as quickly as possible, but I don't want to give you any more information than I have. I don't have a timeline to provide.

THE COURT: Of course.

What's your estimate, as things now stand, of how long a trial we might be looking at?

MS. GRISWOLD: I think if we had a trial that involved both Mr. Naqvi and this defendant, we could be looking at four weeks for the government's case. If it's just this defendant, it's likely to be substantially shorter, in the range of two weeks.

THE COURT: Okay.

Mr. Brafman, what can you tell me?

MR. BRAFMAN: Well, Judge, it would be impossible and probably inappropriate for me to try and respond to what the government said. I've learned about this case this morning, and I've only had less than 15 minutes to actually speak with my client and try and comfort his wife, who, obviously not being involved in any of the allegations, nevertheless is in

the United States so that their son could visit colleges, not for a nefarious purpose.

So I would like to save the opportunity, sir, respectfully, to address the issue of bail when I have more information that could be intelligently provided to the government and the Court.

I'd like to have an opportunity to more substantively discuss the case with the government. I had a brief telephone conversation with the government today. There was a brief outline of some of the same information that your Honor has just been provided.

And I would like to also think about and have some time to learn more about the case before I try and address the issue of a speedy trial concern for a two-week trial that may take years to get up to speed on if their estimate of the amount of materials is accurate, and I don't doubt for a minute that it is accurate.

So I'd like to table some of these issues, with the Court's permission. I'd like to waive a detention hearing without prejudice for a date that we can proceed as quickly as possible. And I would like, if your Honor permits, for us to be in touch with the Court's chambers in terms of scheduling so that we don't make up a date today for which we may not be ready.

THE COURT: That's fine.

1    So for now you would quote my late great senior
2    partner, Simon Rifkind, who said simply that he denies the
3    allegations and defies the alligator who made them.
4        MR. BRAFMAN:  I deny the allegations.  I'll pass on
5    the second part until I know more about the government's proof.
6        THE COURT:  I understand.
7        MR. BRAFMAN:  I have great respect for your late
8    partner, your Honor.
9        THE COURT:  You're not alone.
10       Anything else we can usefully accomplish today, other
11   than fix another date?
12       MR. BRAFMAN:  No.
13       But when we are finished, given the fact that the
14   defendant's wife and the son may be headed back home and he
15   may -- who knows when he'll be able to see them again, if your
16   Honor would permit a very brief noncontact conversation for the
17   defendant and his wife just to be able to say good-bye for now,
18   I hope that would be okay, your Honor.
19       THE COURT:  It's up to the marshals.
20       Who's the marshal?  FBI.
21       So the way we'll do this is he'll be taken into the
22   custody of the marshals; and it will be up to the marshals.
23   And I'll be here till at least 5 o'clock if there's a problem.
24       MR. BRAFMAN:  Thank you, sir.
25       Your Honor, I'm consenting to an adjournment and not

|     |                                                                              |
|-----|------------------------------------------------------------------------------|
| 1   | raising any speedy trial issues today.  I understand that it                 |
| 2   | would be foolish to try and do so.                                           |
| 3   |         And if your Honor wants to set a date, with the                      |
| 4   | understanding, sir, that we may want to come back sooner, then               |
| 5   | I'll obviously be in contact with the government and your                    |
| 6   | Honor's chambers.                                                            |
| 7   |         THE COURT:  I'm going to set a control date when I'm                 |
| 8   | going to want to see you back in any case.                                   |
| 9   |         MR. BRAFMAN:  Yes, sir.                                              |
| 10  |         THE COURT:  Because I want the government to consult                 |
| 11  | with the UK and give me some idea of what I'm coping with.                   |
| 12  |         I don't seriously expect 14 years; though that has                   |
| 13  | happened in *United States v. Fawwaz*.  And I think the whole                |
| 14  | procedure there has been rewritten since that case.  But I just              |
| 15  | don't know what it is.                                                       |
| 16  |         Now, let me get my calendar up here.                                 |
| 17  |         How is a week from today in the afternoon?                           |
| 18  |         MR. BRAFMAN:  Your Honor, that's a problem for me for                |
| 19  | personal reasons.                                                            |
| 20  |         THE COURT:  Okay.                                                    |
| 21  |         MR. BRAFMAN:  If we can have either the date of -- I                 |
| 22  | could do that.  I'm sorry.  I'm looking at the wrong date.                   |
| 23  |         Is that the 18th?                                                    |
| 24  |         THE COURT:  Yes.                                                     |
| 25  |         MR. BRAFMAN:  Yes, sir, that's fine.                                 |

J4BVABDA

1        THE COURT:  Okay.
2        So we'll put it down, for let's, say 4 o'clock.
3        The government, I'm sure, wishes to exclude time; am I
4    right?
5        MS. GRISWOLD:  Yes, your Honor.
6        THE COURT:  Any objection, Mr. Brafman?
7        MR. BRAFMAN:  No, sir.
8        THE COURT:  Time is excluded from now through April
9    18th.  I find that the interest of justice served thereby,
10   including the defendant's interest in getting to know his new
11   lawyer and beginning to cope with the situation he suddenly
12   finds himself in, outweighs the interest of the public and the
13   defendant in a speedy trial.
14       If there is to be a bail application next Thursday or
15   sooner, I'd like a heads up in advance.  I want to make sure
16   pretrial services has done its thing.
17       MR. BRAFMAN:  Yes, sir.
18       THE COURT:  And that's all I can think of for now.
19       Anybody else?
20       MR. BRAFMAN:  Thank you, sir.
21       MS. GRISWOLD:  Thank you, your Honor.
22       THE COURT:  Thank you.
23                           *    *    *
24
25